**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **TIMOTHY WALLIS, and** | ) | |
| **AVIE TERRIS** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | _____ |
| | ) | |
| **THE CITY OF** | ) | |
| **LAWRENCEVILLE, GEORGIA,** | ) | **JURY TRIAL DEMANDED** |
| **a Georgia municipal corporation,** | ) | |
| **and** | ) | |
| **CHUCK WARBINGTON** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

COME NOW Plaintiffs Timothy Wallis ("Plaintiff Wallis" or "Chief Wallis") and Avie Terris ("Plaintiff Terris" or "Mrs. Terris") and submit this Complaint against The City of Lawrenceville, Georgia ("Defendant" or the "City") and Chuck Warbington ("Defendant Warbington" or "City Manager Warbington") (collectively, the "Defendants") pursuant to 42 U.S.C. § 1983 and premised upon the violation of the rights secured under the First Amendment to the United States Constitution.

1

## INTRODUCTION

During his time as the Chief of Police for the City of Lawrenceville, Tim Wallis overhauled the culture of what previously was a toxic Department, appointed to its Command Staff its first ever African American officer and its first female, and navigated the height of the 2020 Black Lives Matter protests with skill and grace by instituting a policy of openness between the department and the public at large and meeting with local community leaders to earnestly discuss the concerns they had with law enforcement.  The Department stood as a flagship for many new programs and initiatives throughout local and state law enforcement agencies.  Those close to the Department and the community at large recognized the tremendous strides that Chief Wallis was making in transforming what he inherited as, in many ways, a broken institution, into one that was functional, more diverse, and existed harmoniously within the community.  Indeed, when interviewed as part of the investigation into the Department, a female officer who has worked at the LPD for five years described Chief Wallis as "supportive of females and of diversity generally."

Despite a thirty-one-year career in law enforcement with an exemplary record, Chief Wallis's reputation is now permanently tarnished, in large part because of the selfish and retaliatory actions of his superior, City Manager Warbington, who issued an all-encompassing order to Chief Wallis and others not to discuss anything

pertaining to the sexual harassment investigation or results of the same with the media. By doing this, Warbington sought to control the narrative to the media of the sexual harassment investigation and insulate himself from allegations that he, among other things, had permitted the target of the sexual harassment investigation, Captain Ryan Morgan, to resign from employment with honor and even a retirement celebration just twelve days before the investigation results were made public that Captain Morgan had engaged in pervasive sexual harassment and other inappropriate actions. Indeed, in the December 16, 2021 letter that Warbington signed commending Morgan's service, Warbington described him as follows: "He epitomizes all aspects of a true leader and will be greatly missed at the City of Lawrenceville."

Needing someone to punish for the actions of Captain Morgan and to deflect attention from his own wrongdoings, he pinned the blame on Chief Wallis by suspending him for ten days, when in fact, Tawnya Gilovanni, whose complaints against Captain Morgan initiated the investigation, reported that Chief Wallis had made just a single offhand remark about the way that she was dressed out of uniform one day. To be sure, he was not the target of Gilovanni's sexual harassment claims. In fact, Captain Gilovanni first reported her purported sexual harassment allegations concerning Captain Morgan to Chief Wallis's wife, who then in turn told Chief Wallis. Even though Gilovanni insisted that she it not be investigated, Chief Wallis

still directed the now Acting Chief Walker to investigate.  Chief Wallis subsequently

followed up with Gilovanni about the same, and she indicated that she was satisfied

with the response and results.

Prior to the release of the investigation results to the media, City Manager

Warbington issued his broad silencing order to Chief Wallis (and others), forbidding

them to speak publicly about any aspect of these matters to the media.  While Chief

Wallis abided by that Order and informed the media that he had been instructed to

direct all inquiries to the City Manager and could not speak about the investigation,

Chief Wallis's wife could not remain silent knowing the truth she was aware of who

was truly culpable and sought to draw attention to the real injustices that inhered in

the situation.  Specifically, Chief Wallis's wife reported to the Atlanta Journal

Constitution ("AJC") that it should look into Captain Morgan's conduct.  Chief

Wallis's wife also advised the AJC to "look real deep into how he [Morgan] got out

of this unscathed and think about who the sacrificial lamb is."  The following

morning, after the AJC published these remarks, City Manager Warbington emailed

Chief Wallis and informed him that he had violated his order not to speak to the

media either "directly or indirectly," which he said "included comments reportedly

from your wife" to the media.

City Manager Warbington further informed him that this infraction would be

discussed with him further.  Five days later, City Manager Warbington met in person

4

with Chief Wallis and instructed him that if he did not retire on the spot, he would be terminated, citing the fact that he had violated his order by speaking to the media as grounds for the termination. He gave him less than ten minutes to decide whether he would retire or be terminated immediately.

Despite the public's interest in the truth behind this investigation and in the integrity of the civic leaders involved, City Manager Warbington wanted only his version of the story disseminated, no matter what the truth really was. Instead of allowing the truth to be revealed, he chose rather to offer up Chief Wallis as a sacrificial lamb, thereby deflecting attention from his own failures as a leader, and in so doing, permitting the real culprit in a sexual harassment scandal, a Captain who resigned in its wake, to leave the department unscathed, depriving the public at large of its right to hear alternative perspectives of this momentous civic event. What remains to be uncovered is why exactly City Manager Warbington took these actions to protect Captain Morgan (ever permitting him to go through with his December 31 resignation after the Glanton Report had been released) and himself, and he instead casted the blame on Chief Wallis, which this lawsuit will endeavor to expose.

In the meantime, Mr. Wallis's reputation is decimated. He may never hold the honor of chief of police again, in an era when the world sorely needs law enforcement leaders like him, and all because of the capricious actions of a self-

interested individual who saw the opportunity to take advantage of his situation and did just that.

## JURISDICTION AND VENUE

**1.**

This Court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. § 1331.

**2.**

Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

**3.**

Plaintiff Timothy Wallis is a male citizen of the United States and a Georgia resident who was employed as Chief of Police of the City of Lawrenceville, Georgia from March 2018 until February 2022.

**4.**

Plaintiff Avie Terris is a female citizen of the United States and a Georgia resident.  She is the wife of Timothy Wallis.

**5.**

Defendant The City of Lawrenceville, Georgia is a body politic and municipal corporation located in Gwinnett County, existing under the laws of the State of Georgia.

**6.**

Defendant Chuck Warbington is, and was at all relevant times, Lawrenceville's City Manager. In that capacity, he had ultimate supervisory authority over Plaintiff and had final policymaking authority with respect to personnel decisions. Per the Lawrenceville Code of Ordinances:

> As the chief executive and administrative officer, the city manager shall… [a]ppoint all and, when he or she deems it necessary for the good of the city, suspend or remove any city employees and administrative officers he or she appoints, except as otherwise provided by law or personnel ordinances adopted pursuant to this charter.

City of Lawrenceville Code of Ordinances, Art. III, § 3.01(b) (2021), https://library.municode.com/ga/lawrenceville/codes/code_of_ordinances?nodeId=PTICH_ARTIIIEXBR_S3.01CIMA.

## STATEMENT OF FACTS

*Background and Promotion to Chief of Police*

**7.**

Chief Wallis began his career in law enforcement with the Gwinnett County Sheriff's Office in 1991. He started with the Lawrenceville Police Department ("LPD" or the "Department") in 1996. Prior to being hired as its Chief of Police, he

had been a Captain within the Department since 2011, overseeing its Uniformed Services Bureau and Special Operations Division.

**8.**

Chief Wallis's promotion to Chief of Police came at the conclusion of an extensive nationwide search in which the City considered over sixty applicants.  As Chief of Police, Chief Wallis was responsible for overseeing all aspects of the Department's operations, including personnel decisions, officer training, emergency responses, and crime prevention, among other things.

**9.**

During Chief Wallis's tenure as Chief, his Command Staff consisted of four persons other than himself:  Major Myron Walker, who reported directly to him, and Captains Phil Byers, Ryan Morgan and Tawnya Gilovanni, who reported directly to Walker.  Chief Wallis appointed each of these persons.  Walker, now Acting Chief of Police, was the first person of color appointed to a Command Staff position in the Department.  Captain Gilovanni was the first ever female officer appointed to a Command Staff or supervisory position in the Department's history.

**10.**

On December 15th, 2021, the Lawrenceville Police Department received the elite status of State Certification through the Georgia Association of Chiefs of Police, a three-year goal for the department instituted by Chief Wallis. As of March

8, 2022, only 41 of the 687 Police Departments in the State of Georgia have achieved this certification.

**11.**

Chief Wallis strove to change the culture of the Department after his promotion to Chief from one that had under the previous administration been described variously by City employees as "grab ass" to having a "good ol' boy", misogynistic attitude.  It was not one that valued diversity, nor was it sensitive to the particular challenges faced by women in the workplace.  In efforts to change these things, Chief Wallis sought to promote women and persons of color to leadership and supervisory positions, to ensure that his command staff, the supervisors, and officers beneath them acted in a respectful and appropriate workplace manner, and to adequately discipline those who failed to do so.

**12.**

While there is obviously still work to be done, Chief Wallis's efforts were highly effective in changing the environment of the Department and the general conception of what was considered acceptable conduct.  One female civilian employee described her working environment as "awesome", and another as "wonderful."  As part of the Glanton Investigation, described below, a female sergeant in the LPD named Dena Pauly stated that Chief Wallis is supportive of diversity and of females.

**13.**

Captain Gilovanni began working for the LPD in 2006 and worked stints in both the Patrol and Criminal Investigations Divisions.  Chief Wallis appointed her Captain of the Uniform Services Bureau and of Special Operations in May 2019.

**14.**

Chief Wallis, his wife, and Captain Gilovanni were close friends.  Gilovanni often confided in Chief Wallis about topics of a highly personal nature such as the unique stresses of the job and marital issues that she had been having.  Chief Wallis's wife had a regular correspondence with Gilovanni in which they also discussed sensitive issues.  At Gilovanni's request, Chief Wallis's wife reviewed her resume for her, and on more than one occasion, they met for lunch.  They also discussed Chief Wallis's wife potentially babysitting for Gilovanni's children.

*The Glanton Investigation*

**15.**

In October 2021, Captain Gilovanni met with Defendant Warbington and Deputy City Manager Steve North to inform them of several issues that she had been experiencing on the job pertaining to alleged sexual harassment, claims of a hostile work environment, and alleged misuse of a trailer owned by the City of Lawrenceville by Captain Morgan.

**16.**

As a result of these complaints by Gilovanni, the City retained the services of the law firm Elarbee, Thompson, Sapp, Wilson LLP to investigate. Attorney Tracy Glanton conducted the investigation and authored the resultant report (the "Glanton Report"). Glanton's investigation reportedly consisted of interviews of twelve persons, including Chief Wallis and Captain Gilovanni, as well as a review of relevant documents and applicable City policies.

**17.**

Much of the investigation was concerned with the behavior of former LPD Captain Christopher Ryan Morgan, who announced his resignation to be effective as of December 31, 2021 in the wake of the Glanton Investigation and just days prior to his scheduled interview. The Glanton Report is largely concerned with accusations that Gilovanni made against Morgan, including that he sent her a number of sexually inappropriate text messages, made sexually inappropriate comments to her while on the job, and that he used a trailer owned by the City to sleep while on the job.

**18.**

While Gilovanni frequently complained to both Major Walker and Chief Wallis about Morgan's behavior, it was always about his work ethic and accountability rather than behavior which might have been construed as sexually

harassing or hostile.  Gilovanni never complained once to Chief Wallis about Morgan's inappropriate sexual behavior.

### 19.

In October 2019, Gilovanni contacted Plaintiff Terris to confide in her about Morgan's behavior.  After Chief Wallis learned of this behavior, in accordance with the LPD's Department Operations Manual, Chief Wallis assigned Major Walker, his second in command and liaison between him and his Captains, to investigate the issue.  Chief Wallis took this step, despite Gilovanni's **insistence** that she would handle it herself, due to his concern about the issues she raised, limited though they were.  Chief Wallis followed up on the status of Gilovanni's concerns to ensure that she was satisfied with the results of Major Walker's handling of the situation, which she indicated she was.

### 20.

The Glanton Report also revealed Gilovanni's complicity in the types of behavior that Chief Wallis sought to repress in the workplace.  To name just a few examples, Gilovanni once stated to a number of other officers that she was "going home to get some d*ck," since she and her husband had their kids at a babysitter. She asked other employees, "Do you want see pictures of my shaved kitty?" as in innuendo referencing her recently groomed cat.  On one occasion, Gilovanni said

openly in the middle of police headquarters, "My d**k might be bigger than all ya'll's," and "I've got a bigger set of balls than all of you."

### 21.

To address these inappropriate comments, in subsequent Command Staff meetings, Chief Wallis stated that what used to be funny was not funny anymore, that Command Staff members were held to a higher standard, and that as leaders in the Department, they were expected to lead by example.

### 22.

The Glanton Investigation also revealed a covert recording that Gilovanni made of a meeting between herself and Wallis on October 20, 2021. Gilovanni had come to complain about Captain Morgan's use of the trailer during working hours. At some point in this conversation, Chief Wallis stated that on one day during the previous few days, Gilovanni looked like she worked at Hooters because she had removed her uniform shirt and was wearing a bright pink t-shirt around the office after the air conditioning had gone out.

### 23.

While Chief Wallis knows the comment was poorly advised, he felt at the time that it was good natured, in keeping with what he felt was the tone of the conversation, and consistent with comments that they would both make to one another. This comment was also in the context of Gilovanni's frequent complaints

regarding how other officers and supervisors did not respect her given that she was promoted to Captain in an unprecedented manner, being the first to be promoted to Captain without first holding a supervisory position.  Chief Wallis meant to express that her unprofessional attire that day did not help the image that she was trying to convey as a Command Staff officer.  For this single comment, Chief Wallis has been wrongfully labeled as a sexist and sexual harasser of women.

*Aftermath of the Glanton Investigation*

**24.**

On January 11, 2022, Defendant Warbington formally notified Chief Wallis of the City's intention to suspend him for ten days beginning on January 21, 2022 (later changed to January 28) without pay, based on the findings of the Glanton Investigation, but after that time, he would return to his duties as Chief of Police.

**25.**

Chief Wallis was concerned about how the story would appear in the news and the effect it would have on his reputation, career, and family, so he asked Defendant Warbington if he would be allowed to defend himself or the Department when he was inevitably contacted by the media.

**26.**

In anticipation of the news stories that would follow in the wake of the public release of the Glanton Report on January 27, 2022, Defendant Warbington instructed

Chief Wallis on what he would and would not be allowed to say to reporters. Specifically, Defendant Warbington instructed Chief Wallis to say only that the matter was being handled internally and to refer all questions to him regarding the Glanton Report and the incidents relate thereto.

**27.**

In a meeting on January 21, 2022, Defendant Warbington intimated to Chief Wallis that he wanted to be able to personally "control the message" stemming from the story. He also assured Chief Wallis that he still had his job, as well as the support of the mayor, the City Council, and himself. He further attempted to sympathize with Chief Wallis by stating that the victim in the case (i.e., Gilovanni) "is not a sweet little young lady." Defendant Warbington also stated that the situation would have been a lot different if former Captain Ryan Morgan had been interviewed as part of the investigation, implying if that had that been the case, Chief Wallis would not have been disciplined and scapegoated.

**28.**

Were he not under threat of discipline if he were to have spoken to the media, Chief Wallis would have acted to defend his reputation more strenuously, and in so doing assure the citizens of Lawrenceville that their police Chief was not the aggressive, unmeasured leader as which he had been portrayed and that the Department that he managed was not one where women were treated as they had

been years before.  Moreover, this restraint prohibited Chief Wallis from expressing what he believed to be inappropriate actions by the City Manager in permitting Morgan to escape reprisal for his actions.  Such speech would have also allowed the public access to a fuller and less biased picture of how the City and its officials handled the investigation, the release of the report, and its aftermath.

### 29.

On the evening of January 26, 2022, Chief Wallis answered two unsolicited phone calls from Johnny Edwards, a reporter from the Atlanta Journal Constitution, who he had never heard of or spoken to previously.  On these calls, Edwards inquired about the nature of the sexual harassment investigation within the LPD.  Chief Wallis informed him multiple times that his City Manager had directly forbidden him from commenting on the investigation, that all inquiries should be directed to him, and denied having ever sexually harassed anyone throughout his career.

### 30.

Chief Wallis's wife, Mrs. Terris, also spoke to the AJC reporter.  Specifically, she reported to the AJC that it should look into Captain Morgan's conduct.  Chief Wallis's wife also advised the AJC to "look real deep into how he [Morgan] got out of this unscathed and think about who the sacrificial lamb is."

**31.**

The following day, after the AJC published Mrs. Terris' remarks, City Manager Warbington emailed Chief Wallis and informed him that he had violated the City Manager's order not to speak to the media either "directly or indirectly," which he said "included comments reportedly from your wife."  City Manager Warbington further informed him that this infraction would be discussed with him further.

**32.**

On January 31, 2022, while Chief Wallis was suspended, Defendant Warbington called Chief Wallis and instructed him to attend a meeting with him the next day, but he would not tell him what it was about.  In an attempt to gauge whether this was a termination meeting, the Chief Wallis asked if he should bring his attorney for representation.  Defendant Warbington told him that would not be necessary. When Chief Wallis arrived at this meeting, Defendant Warbington sat him down and told him that he had disobeyed his instructions by speaking to the media.  He gave Chief Wallis the choice of being terminated or retiring and commanded him to decide on the spot.

**33.**

Chief Wallis pleaded for time to consult with his family, and Defendant Warbington begrudgingly allowed Chief Wallis just ten minutes to make a phone call to his wife and arrive at a decision.

**34.**

Feeling that he had no other choice, Chief Wallis signed a piece of paper stating that he would retire.

**35.**

Following his termination, Defendant Warbington promoted Myron Walker to the position of Acting Chief of Police.

**36.**

After Walker's promotion, Defendant Warbington set up a press conference for Walker for which he provided Walker a script and permitted him to address the scandal described in the Glanton report and his role in it, as well as allegations of his own misconduct that involved his having had an extramarital affair while using Gwinnett County property years before.

**37.**

As a result of Defendants' actions in this case, Chief Wallis's reputation has been permanently damaged.  He has been unable to secure employment with any other police departments to date.

## COUNT I
## PLAINTIFF WALLIS'S CLAIMS FOR
## VIOLATIONS OF THE FIRST AMENDMENT
### (Asserted via 42 U.S.C. § 1983)
*As to both Defendants*

**38.**

All previous paragraphs are incorporated by reference as if fully set forth herein.

**39.**

Defendants violated rights protected by the First Amendment of the United States Constitution which are asserted by Plaintiff Wallis through 42 U.S.C. § 1983, through various actions, including issuing an unlawful restraint on speech, threatening him with an unlawful restraint on speech, and then constructively terminating his employment.

**40.**

In several conversations following the release of the Glanton Report, Plaintiff Wallis broached to Defendant Warbington the possibility of speaking to the news media in order to ameliorate the effect that the stories were having upon his reputation.

**41.**

As his superior, Defendant Warbington was empowered to grant or deny Plaintiff's application to speak to the news media.

19

**42.**

The approval or denial of Plaintiff's application to speak to the news media in this capacity required an affirmative decision on the part of Defendant Warbington.

**43.**

Defendant Warbington's decision between approving and denying Plaintiff's application to speak to the news media was not a matter of routine but involved the appraisal of facts, the exercise of judgment, and the formation of an opinion as to its propriety.

**44.**

Defendant Warbington denied Plaintiff Wallis's request and issued a broad restraint on him speaking to the media regarding incidents related to the Glanton Investigation, as described with more precision in the factual allegations above.   In addition, Defendant Warbington applied this restraint as prohibiting not just Plaintiff Wallis, but also his wife from speaking to the media about these matters.

**45.**

In addition, Defendants engaged in impermissible viewpoint discrimination by permitting the City Manager to speak about the Glanton Investigation, but not permitting Plaintiffs to do the same.  Likewise, the City permitted Myron Walker to publicly address the sexual harassment scandal and his role in it in a press conference

that Defendant Warbington arranged, going so far as to prepare a script for him, while placing an absolute bar on Plaintiffs' speech on the same topics.

**46.**

Moreover, Defendants permitted Captain Gilovanni to speak indirectly through her attorney to the media regarding the Glanton Investigation, but they terminated Plaintiff Wallis's employment after his wife spoke out about the investigation and criticized the City and Plaintiff Wallis denied engaging in sexual harassment.

**47.**

Chief Wallis's wife reported to the AJC that her husband was being cast as a "sacrificial lamb" and urged the reporter to look into why Captain Ryan Morgan had been able to resign without being interviewed and without any adverse actions being taken against him. When Chuck Warbington discovered Mrs. Terris made these comments to the reporter, he again violated Chief Wallis's First Amendment rights, scolding him and reiterating the unlawful restraint, applying it now expressly to his wife. In so retaliating, he also violated Chief Wallis's First Amendment rights to freedom of intimate and expressive association.

**48.**

Moreover, Plaintiff's own comments to the media during this same conversation were made as a private citizen on a matter of public concern. By

making these comments, Plaintiff engaged in activity protected under the First Amendment to the United States Constitution.

**49.**

Just five days later, Defendants' First Amendment violations culminated in Plaintiff being forced to choose between immediate termination or retirement. Defendants stated as grounds for the termination the violation of their unlawful order restraining him or his wife from speaking to the media.

**50.**

Defendants terminated Plaintiff by subjecting him to terms and conditions of employment so intolerable that no reasonable person would have felt they had any choice but to retire.

**51.**

Plaintiff's engagement in constitutionally protected speech and/or association was a motivating and substantial factor for Defendants' adverse employment actions.

**52.**

These and other actions taken by Defendants constitute an unlawful prior restraint, retaliation for constitutionally protected speech, viewpoint discrimination, and violation of the right to intimate and expressive association, all rights protected by the First Amendment.

**53.**

Defendants were at all times acting under color of state law and acted in bad faith, intentionally, or recklessly.

**54.**

By restraining Plaintiff's constitutionally protected speech as described above and by terminating Plaintiff's employment in retaliation for his constitutionally protected speech and protected association with his wife, Defendant Warbington acted in contravention of clearly established law.

**55.**

Defendant Lawrenceville is liable along with Defendant Warbington for Plaintiff's damages because Defendant Warbington was the final policymaker with respect to the actions at issue, i.e., personnel decisions and the control of employee speech to external outlets.

**56.**

Plaintiff has been damaged as a direct and proximate result of Defendants' deprivation of his First Amendment rights and seeks all damages and equitable relief permitted by law, including but not limited to, compensatory damages, special damages, punitive damages, attorneys' fees, pre and post judgment interest, and costs.

**COUNT II**
**PLAINTIFF TERRIS' CLAIMS FOR**
**VIOLATIONS OF THE FIRST AMENDMENT**
**(Asserted via 42 U.S.C. § 1983)**
*As to both Defendants*

**57.**

All previous paragraphs are incorporated by reference as if fully set forth herein.

**58.**

Defendants violated rights protected by the First Amendment of the United States Constitution which are asserted by Plaintiff Terris through 42 U.S.C. § 1983.

**59.**

Defendants violated Plaintiff Terris' First Amendment rights in various ways, including by issuing a broad and unconstitutional prior restraint that prohibited her from speaking in any fashion to the media regarding sexual harassment allegations against her husband and incidents related to the Glanton Investigation, as described with more precision in the factual allegations above.

**60.**

Plaintiff Terris reported to the AJC that her husband was being cast as a "sacrificial lamb" and urged the reporter to look into why Captain Ryan Morgan had been able to resign without being interviewed and without any adverse actions being taken against him.  When Chuck Warbington discovered Plaintiff Terris made these

comments to the reporter, he reiterated his unlawful restraint, applying them expressly to her.

### 61.

In addition, Defendants engaged in impermissible viewpoint discrimination by permitting the City Manager to speak about the Glanton Investigation and resulting actions, but not permitting Plaintiffs to do the same.  Likewise, the City permitted Myron Walker to publicly address the sexual harassment scandal and his role in it at a press conference that Defendant Warbington arranged, going so far as to prepare a script for him, while placing an absolute bar on Plaintiff Terris' speech on the same topics.

### 62.

Moreover, Defendants permitted Captain Gilovanni to speak indirectly through her attorney to the media regarding the Glanton Investigation and incidents related thereto without reprisal, but they constructively terminated Plaintiff Wallis's employment after his wife spoke out about the investigation and criticized the city's focus and result of the investigation and Plaintiff Wallis denied engaging in sexual harassment.

### 63.

Just five days after the City Manager's reprisal of Plaintiff Wallis for his wife's comments to the media, Defendants' First Amendment violations culminated

in Plaintiff Wallis being forced to choose between immediate termination or retirement.  Defendants stated as grounds for the termination the violation of his unlawful order restraining him or his wife from speaking to the media.

**64.**

Defendants terminated Plaintiff Wallis by subjecting him to terms and conditions of employment so intolerable that no reasonable person would have felt they had any choice but to tender resignation.

**65.**

Defendants' termination of Plaintiff Wallis's employment was an act of retaliation against Plaintiff Terris for her exercise of her First Amendment rights to speech as a private citizen and her intimate and expressive association with Plaintiff Wallis.

**66.**

Plaintiff Terris' engagement in the constitutionally protected speech and association as described above was a motivating and substantial factor for Defendants' termination of her husband, Plaintiff Wallis's employment.

**67.**

Defendants were at all times acting under color of state law and acted in bad faith, intentionally, or recklessly.

**68.**

By restraining Plaintiff Terris' constitutionally protected speech as described above and by effectively terminating Plaintiff's employment in retaliation for his constitutionally protected speech and association, Defendant Warbington acted in contravention of clearly established law.

**69.**

Defendant Lawrenceville is liable along with Defendant Warbington for Plaintiff's damages because Defendant Warbington was the final decisionmaker with respect to the actions at issue, i.e., personnel decisions and the control of employee speech to external outlets.

**70.**

Plaintiff Terris has been damaged as a direct and proximate result of Defendant's deprivation of her First Amendment rights and seeks all damages and equitable relief permitted by law, including but not limited to, compensatory damages, special damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiffs respectfully request judgment in its favor on each count in this Complaint and demands:

(a)    That judgment be awarded for and in favor of Plaintiffs and against Defendants on Counts I and II for all relief allowable by law;

(b)    That Plaintiffs be awarded attorney' fees pursuant to 42 U.S.C. § 1988 or other applicable provisions of state or federal law;

(c)    Any and all other relief as the Court deems just and proper.

This 24th day of March, 2022,

/s/ James M. McCabe
_____
James M. McCabe
Georgia Bar No. 724618
S. Graham White
Georgia Bar No. 535538

The McCabe Law Firm, LLC
3355 Lenox Road
Suite 750
Atlanta, GA  30326
Office: (404) 250-3233
Fax: (404) 400-1724
jim@mccabe-lawfirm.com

Attorneys for Plaintiff